Good morning. Good morning, Judge Pooler. May I proceed? Yes, please proceed. May it please the Court, Gary Stein on behalf of Plaintiff Appellant Lazare Kaplan. Judge Lynch, when he was a district judge, once articulated the principle that a foreign selection clause cannot be used to hijack a case by applying it to tort claims or other contract claims that aren't related to the contract containing the clause. That principle we submit governs this case. The district court here held that Lazare, which for more than a century was a leading diamond company in this city, which was listed on the American Stock Exchange, which was thriving until the actions of the defendants destroyed its business, has to go to Belgium to litigate its claims because of a foreign selection clause in a bank account agreement that has no bearing on either of the two categories of claims Lazare has asserted, and that was error as a matter of law. Let me begin with Lazare's theft-related claims, which are really at the heart of this case, the heart that's at the heart of their, the RICO claims. The bank's knowing theft of more than $135 million in funds that came from the sale of diamonds that belonged to Lazare and its affiliates. Those... Is that being litigated in Belgium now, the very theft you discussed? No, Your Honor, it is not. Has it ever been litigated? Has there been any charges? No. It is under active investigation by Belgian criminal authorities, which are taking the claims quite seriously and have raided KBC's offices and are interviewing witnesses, but it has not been the subject of any litigation in Belgium. When did the alleged theft take place? Approximately 2007 to 2010. So that's more than 10 years already, correct? Yes. We brought the lawsuit in 2011, Your Honor. And Lazare has... Listen, listen... The impact on... I'm sorry, Judge Winner. You're not here, Judge Poore. I can hear the counsel. You're not here, Judge Poore. I'm sorry. If I speak into the microphone, is that better? Yes. Okay. I will try to do that. I was asking about the theft claims, when they originated and where they're being tried, if at all. Go on. Any or not. And the point is, Your Honor, is that those claims do not depend on, and they really have nothing to do with the banking agreement that contains this form selection clause. It has nothing to do with any bank account that Lazare may have had at ADB. The scheme worked, in short, as follows. Diamonds owned by Lazare were consigned to this fellow, Erez Dalio, his entities specifically, pursuant to contract with Dalio. Nothing to do with the banks. The Dalio entities sold those diamonds and had their customers wire the proceeds to the pooling account that ADB maintained at KBC in New York. Again, nothing to do with Lazare's contractual relationship with the banks. And when the funds hit New York... Wait. Can I ask a question? Why do you say that it's limited to the contractual relationship? The form selection clause in Belgium talks about any account holder agreeing to bring that the courts of Antwerp, Belgium will have exclusive jurisdiction with respect to any action brought against the bank. So why is it limited to contract claims? It's not limited to contract claims, Your Honor, and that's not our position. Why wouldn't it include these tort claims? It is limited to claims that relate to the contract, and I say that both because of case law, the controlling case law, and because of the contract itself. Claims... And we cited in our reply brief numerous cases, including decisions by Judge Posner and by Judge Arterton and Judge Block within this circuit, recognizing that even the most broadly written form selection clause or arbitration clause, just as broad as what you read, is limited, only applies to claims that are related to the contract. And those cases literally call the position taken by KBC and the district court here absurd because it is. And I would like to add to that list of cases... A fraud claim would never be subject to a form selection clause. It could be. If it... And this court has articulated principles in its decision. It's asked that the claim depend on a breach of contract. Does it assert any rights or duties under the contract? Does it depend upon an interpretation of the contract? Where it does, a fraud claim could well be subject to a form selection clause. We don't dispute that at all. But the answer to those questions in this case, each and every one of them, is no. And as I was about to say, Judge Coate on July 31st, after the briefing, issued yet another decision, and it's called General Electric versus Lighting Science Group, 2019 Westlaw 3451128, where the contractual, the form selection clause said, quote, the state and federal court shall have exclusive jurisdiction over any dispute between the parties. Judge Coate nonetheless held that, and this was on a motion for preliminary injunction, that that clause applied only to the extent a dispute relates to the agreement and not to any and all unrelated disputes that may arise between the parties. And as Judge Coate said in that opinion, Judge Sullivan, you have to read the contract not in isolation, but in context. Okay, so if there were a slip and fall on the steps of the bank, then this clause wouldn't apply. But this is about your alleging theft by the bank of the funds that have been entrusted with the bank, right? But not from our account, Your Honor, and not entrusted by us. No, that is not the way the scheme worked. This exact same theft could have happened if Lazar never had a banking relationship with these banks, but instead bank as it did bank with HSBC and other banks. The theft happened when Daliot instructed his customers to wire their funds to the pooling account in New York where they were misappropriated and applied to reduce his debts to the bank. It has nothing to do with our bank account, our agreement, or anything. To the Belgium account of your client. No, Your Honor, that's not correct. Daliot was obligated to pay us, but he could have paid us anywhere, in any account. You allege that was an intentional misappropriation by the banks? Yes. Or negligence? No, absolutely intentional, Your Honor. And if I may, the complaint, very briefly, sets out a plethora of facts demonstrating why we believe that's the case. There was a painstaking investigation done by Lazar here over the course of years which showed that the banks had extended loans to Daliot before the financial crisis and all sorts of uncollateralized and illiquid investments that when the financial crisis, which were beyond its mandate and that they knew should not have been extended, when the financial crisis hit, they posed an existential threat to their existence because the outstanding loan to Daliot was $120 million, which was more than half of ADB's capital. And KBC, its parent, had guaranteed that. Moreover, they faced exposure of the improper loans. And the complaint sets forth a number of facts that show... They were willing partners in the appropriation, the misappropriation. Yes, Your Honor. That is absolutely the claim set forth in the complaint. And it is the claim that Belgian authorities are investigating. It is a very serious claim. That is why we brought a RICO claim in this district, because we have a real RICO claim. We were the victim of a massive theft. So you're then suggesting that it really all took place here and not in Belgium. Is that right? I don't want to overstate it, Your Honor. I don't want to say that everything happened here. But the theft itself happened here. There was a misappropriation from the bank account. The pooling account is here. Is that right? The pooling account is here. Absolutely. And the predicate acts for RICO are interstate or international transportation of stolen property, wire fraud, money laundering, and, as Your Honor well knows, those are all properly pleaded. Indeed, they moved to dismiss below the RICO claim. They didn't attack the plausibility or the sufficiency of those allegations. It's a theft that occurred in New York. Aren't you fighting sort of a last war now? Well, I mean, the prior panel sent this back to Judge Carter to assess the form selection clauses, and your response to that is the form selection clauses don't apply. To the theft-related claims, they do not apply. Well, that's the whole ballgame, right? No. We have a number of claims that really arise from the bank's unlawful termination of the credit facility, and that's a different kettle of fish. And so the prior panel, when it sent it back for a parsing of form selection clauses and parties, really missed the forest for the trees, though, because they didn't need to do that, right? The theft claim should have just proceeded without any consideration of a form selection clause. Right? Isn't that what you just told me? Those arguments weren't presented at the time before the panel, but they certainly were not waived. The panel correctly recognized that ultimately the question is what claims are subject to the form selection clause, and that's what was handled below. There was a hearing on one issue as to that. What claims are subject to the form selection clauses at this point? You're saying the RICO claims are not. Those claims are not, right? Correct. Absolutely. And then, by the way, that includes the New York form selection clause. We don't contend. Correct. What claims are subject to what form selection clause? So it's the contract-related claims, which are claims. There's only one contract-related claim, isn't there? No, no, no. There are multiple. Good faith and fair dealing? There's the good faith and fair dealing. That's one of them, and the court held that that actually was subject to the New York form selection clause. There are also claims that arise from the bank's misconduct in relation to the credit facility, including in particular its unlawful termination of the credit facility. There's a tortious interference claim, for example. There's a declaratory judgment claim that we don't owe money. The tortious interference claim is subject to a form selection clause. Which one? The New York form selection clause. In our view, and if I may add, Your Honor, in any event, not subject to the Antwerp form selection clause. We also take the position that it is governed by the credit conditions agreement, which has its own form selection provision, but that provision does not require Lazar to bring claims in any particular form. It certainly doesn't require it to bring them in Belgium. And if I may, those claims, again, fall outside the Antwerp form selection clause because they have nothing to do with any bank account that Lazar may have had at ADB in Belgium. They are brought in Lazar's capacity as a borrower, which is the noun used in the credit conditions agreement, and not as an account holder. But you can't be a borrower unless you're an account holder, according to the two agreements. They're related, aren't they? That's what Judge Carter found. Yes. But the question is, which form selection provision is controlling, the one in the credit conditions or the one in the New York agreement or the one in the banking conditions? And if you look at the credit conditions and the banking conditions side by side, you'll see that it's not the case that the credit conditions picks up the form selection clause in the banking conditions, which is KBC's contention. If that had been the party's intent, they would have simply cut and pasted it from the banking conditions, it's Article 37 of the banking conditions, into Article 24 of the credit conditions. They didn't do that, and they did do precisely that with a number of other provisions in those articles. For instance, Article 37 of the banking conditions has an express waiver of jury trial by the account holder. Article 24 of the credit conditions has an identical provision that's expressed in terms of the borrower waiving its right to a jury. If KBC were correct and the provisions for account holders under Article 37 were already incorporated by reference into Article 24 of the credit conditions, there would have been no reason to include a separate jury waiver in that clause. And what that tells you is that when the parties intended for the same provisions in Article 37 of the banking conditions to apply under Article 24 of the credit conditions, they said so explicitly, and it tells you that their failure to say so explicitly with regard to the Antwerp form selection clause means that you cannot read that clause into the credit conditions. And, Your Honor, Judge Carter did say that every borrower is an account holder, but that doesn't change the fact, and I don't think KBC does or can seriously dispute, that the claims we are bringing have to do with the credit facility and the credit conditions and the termination of that credit facility in our capacity as a borrower. We are not alleging, as in the middle means case that you handled in the district court, that there was some improper activity in the bank account at ADB. We have no claim to that effect. Thank you. You are reserved two minutes for rebuttal. Thank you. We'll hear from KBC. Good morning, Your Honors. When Lazar decided to enter into a relationship with Antwerp Diamond Bank, they agreed to be bound by a broad mandatory form selection clause. Or two. Well, they agreed to be bound in terms of when they bring their claim. Let me just cut to the chase, picking up where Mr. Stein left off. So what is the point of having a credit facility and banking, separate contracts that have separate provisions with respect to how you bring suit and where you bring suit and how disputes get resolved? Sure, Your Honor. Well, there are different obligations in the different agreements, but there is only one form selection clause related to customers, related to account holders, and that is in the Antwerp form selection clause. And that swallows the credit agreement. I wouldn't say that it swallows the credit agreement. The credit agreement and the banking agreement describe the credit conditions as being an integral part of the banking conditions. The banking conditions, as Your Honor said, an account holder, you can't be a borrower without being an account holder. And so anyone who is a borrower has an account at Antwerp Bank. And the reason is because that is how credit was extended. It was extended by getting a bank account, basically a normal bank account, with an additional element to it, with an additional piece to it. And that piece allows you to overdraft that account, to take out more money than exists in that account. I think we know what it all means. I guess the question is, if there's a form selection clause in the banking agreement, why wouldn't there also be one in the credit agreement if you're arguing that it can't be one without being the other? Let me answer it in a couple of ways, Your Honor. The main answer is that it wasn't needed. Any borrower is also an account holder under the Antwerp form selection clause. An account holder, such as Lazar, has to bring any claim in Antwerp, Belgium. That's the first part of it. Even slip and fall on the steps. Well, I think that any means any, Your Honor. And I would point the Court to the Supreme Court's decision in M.F. Brehman v. Zapata. There was a contract, a form selection clause, that says any dispute that arises between the parties. And the Supreme Court said that is, quote, all-encompassing, and it's entitled to full effect. So, yes, I think any does mean any. Your Honor, there are hypotheticals that we could get into. I don't think this case comes close to those hypotheticals because I think the claims are, in fact, related, and I'd be happy to get into that. But let me just say— I'm just asking you, what's the answer to that question? That, too, would be any claim. Yes, Your Honor. I think any, any claim, and any means any. And I want to point to Article 37. This is where the Antwerp Forum Clause appears, and it says—it has a bunch of different provisions. It has a provision regarding jury instruction, a jury waiver, and that is only for claims related to the banking conditions. And there's a service of process waiver, and that is only for claims related to the banking conditions. There's a form clause for claims brought by the bank, and that is only for claims related to the banking conditions. In the middle of Article 37, you have the Antwerp Forum Selection Clause, that doesn't have that condition. It doesn't have any limitation on it. And the drafters used very different language for one provision than they did for the other, and that provision should be given effect the way that the drafters wrote it. That said, I think that Lazar's tort claims do all have their genesis in the banking and credit relationship between Antwerp Bank and Lazar. Lazar says that the banking conditions cover only banking, only account holders, and the credit conditions cover only borrowers. That is just simply not true. The credit conditions, and this is at A6652, the credit conditions, Paragraph 2 at A6855, and the banking conditions at Paragraph 9, A6850, they all say that Lazar's credit, their loans, and their credit facility, their overdraft facility, are all governed by the banking conditions as well as the credit conditions. And I want to point the Court to two things in the banking conditions that are very much related to the claims that we're talking about here. The first is Paragraph 11 of the banking conditions, which has to do with the extension of credit. That's in the banking conditions. It's not in the credit conditions. There are other provisions in the credit conditions, but it's in the banking conditions. Also, my friend talked about termination. Termination is also covered in the banking conditions. So you disagree with Judge Carter finding that the breach, the covenant of good faith and fair dealing, you don't think that should have been under the KBC agreement at all? I think as it relates to KBC, the claim against KBC, not the claim against Antwerp Bank, I think that Judge Carter's decision makes sense, that that claim arises, is a dispute related to the terms and conditions. Isn't that any claim under your formulation? No, Your Honor, I don't think that it is. The first part of that provision does say any claim, but then the rest of the provision restricts that. It weighs in on that, and it says only claims that are over, disputes over the terms and conditions, or disputes over other account agreements between Lazar and KBC. That limitation in the second half of the Forum Selection Clause, the New York Forum Selection Clause, is the reason why that provision is limited, I think, only to those claims that are really closely connected to the KBC contract, where that isn't the case with the theft-related claims. I want to make sure that I talk about the tort-related claims and how they are related to the banking conditions. Lazar really runs away from the allegations that are in its complaint, and so I want to talk about those specific allegations. We identify three different reasons in our brief why Lazar's claims are related to the banking conditions, but let's look at some of the language in their claims. So their conversion claim, for example. The conversion occurred when the banks prohibited Lazar from receiving its monies and property by applying such monies to the accounts of others. That's connected to the banking relationship, to the credit relationship. Lazar doesn't get the money because it goes to somebody else. Their unjust enrichment claim. The banks have been enriched by their refusal to return to Lazar the proceeds from the diamond sales and by loans to the Deliat entities being repaid using Lazar's diamond facilities. The declaratory judgment claim. Antwerp Bank diverted Lazar's diamond proceeds away from Lazar toward the payment of the Deliat debts entities. These are all allegations in their first amended complaint, in the operative complaint, and it is all about diversion, taking money away, misappropriating is the word that my friend used while he was up here, misappropriating, as in the money should have gone to Lazar and it went to somebody else instead. The same is true of the RICO claim. The RICO enterprise, as they define it, the bank's role in the RICO enterprise is five things. Exert pressure over Lazar through ABD's role as lender. Hold Lazar responsible for amounts borrowed by Lazar. Quash Lazar's efforts to trace and investigate the theft. Intimidate Lazar into abandoning its efforts to recover. Destroy Lazar's business and its ability to operate. All of those are about the banking and credit relationship that existed between Antwerp Bank and Lazar. That is a relationship that they say that our client misappropriated, stole their money. The theft occurs, they say, when the money comes into the bank and is earmarked for somebody else. They say the bank knew that the money was theirs and that the bank should have given the money to them but instead gave it to somebody else. That's where? New York or Belgium? That all occurs in Belgium, Your Honor, because the money comes into KBC New York, but the loans, the credit, the debt, that's all in Antwerp, Belgium. So the money should have been, they say, credited to their account at Antwerp Diamond Bank to reduce the debt they had. Instead, they say, it goes to the Deliat Entity. It goes to a pooling account. Where is the pooling account? The pooling account is in New York. It's in KBC New York. And the pooling account should have gone to one account and it went to a different account, isn't that what they're alleging? Yes, in Antwerp, Belgium. That's right, Your Honor, that the money comes into a pooling account, a general account for Antwerp Diamond Bank in New York, and Antwerp Diamond Bank then needs to take that money and credit it to the appropriate account. Also in New York, don't they? No, no, that is all what's in Antwerp, because their credit is in Antwerp. KBC never loaned any money to KBC. All of the loans, all of the debt is all in Antwerp. It's all with Antwerp Diamond Bank. The pooling account is here, and the allegation is that the pooling account was misappropriated, basically, right? They took money from the pooling account here and sent it to somebody to whom it didn't belong. Right. The theft is that Antwerp Diamond Bank should have given that money to Lazar. Isn't that theft in New York? No, because the money is received... Once the pooling account is accessed, isn't that when the theft takes place? No, Your Honor, the theft takes place in Belgium because the theft is putting the money in the Deliat Entities bank account in Antwerp, not putting it in Lazar's bank account in Antwerp. The theft is when the money doesn't end up in their account, and their account is the one that is in Antwerp, Belgium. But even if the theft did occur in New York, I go back to the Forum Clause. The Forum Clause says any dispute, any claim that Lazar brings... The Forum Clause in Belgium doesn't specifically reference KBC, right? So then you need to rely on the relatedness doctrine, right? That is right, Your Honor. Okay. And so these are related entities. Nobody is disputing that. I don't think even Mr. Stein is disputing that. That's correct, Your Honor. So your view is that anything that's not covered specifically by the New York Forum Selection Clause sort of reverts back to the Antwerp one, which is broader. Is that what you're saying? I think that's basically right. Let me just rephrase it. So I think that the Antwerp Forum Clause covers all the claims against ADB, against Antwerp Bank. I think it also covers, through the closely related doctrine, all the claims against KBC that are not covered by the New York Forum Clause. So the New York Forum Clause covers the one claim, which I'd love to turn to if I have a moment. It covers that one claim. That's what the district court held below. The district court held, right. So you're saying just that one claim. Just that one claim. Why doesn't it go the other way? Why doesn't relatedness go the other way too? Because the New York Forum Selection Clause refers to any other agreement, right, or agreement. Any other agreement with KBC. Well, if KBC and ABD are related, then why doesn't ABD get swept into the other agreements as a related entity? So for the same reason that the New York Forum Clause would govern the claims that fall within it, it is more specific. It is narrower with regard to the claim, that one claim against KBC. All the claims against Antwerp Diamond Bank, the Antwerp Forum Clause is much more specific. It says claims against Antwerp Diamond Bank. They don't even exist anymore, right? They've been absorbed. That's correct, Your Honor. KBC is the successor, right? That's right. They are the successor, and Judge Carter at SPA 21 citing to the New York banking regulations with regard to absorption said that doesn't change anything. The reason is that your contractual obligations don't change when there is an absorption. That is an argument, that is a holding that has not been addressed at all by Lazar. That's what the district court held,  They never refer to that part of the holding. They never refer to the banking regulations in New York. If you would permit me, I did want to get to the one New York claim that Judge Carter addressed, which was the good faith and fair dealing contract claim, and he concluded that it was time barred because of the statements provision in the agreement. That's right, Your Honor. What do these allegations have to do with statements? These statements, there's a zero balance account, right? These statements are always going to show, at the end of every day, a zero, right? Well, that's right. They will show transactions. Well, I mean, how would an account holder know from these statements that their accounts have been pilfered? Sure, Your Honor. Let me walk through it, and let me start with what they say in their reply brief, which is that there's no allegation anywhere that says any of this money was supposed to go into the pooling account, and there's no allegation anywhere that they knew that these sales were happening. No allegation that it went to the pooling account? That's what they say. So let me walk through the allegations in their amended complaint, the allegations that they have that prove those things. So the first thing is, paragraph 330 of the amended complaint, this is at A-9291, Lazar alleges that the funds were supposed,  to be deposited into Lazar's KBC New York account, unquote, and then credited to Lazar's account. Second, Lazar knew when these transactions happened, when the Deliat entities made these sales. This is going back to their original complaint now, A-127 to A-130. Lazar explains that whenever there was a transaction, Deliat and a sale, that Lazar handled the invoicing. They handled the various invoices, so they knew that a sale had happened. And third, and absolutely critically, Lazar alleges that the nature of these credit finance transactions was that the banks insisted, they required that the proceeds immediately be put into the bank after there was a sale, so they could track all of the money going in the various different directions. Lazar alleges that Antwerp Bank followed that policy. This is at A-86, paragraphs 132 to 134 of the original complaint. So what happens when you put that all together? They knew of the sales, they expected money to go into their account, the money had to go into the bank immediately. It's in the New York account, right? Yes. And then from there, it's supposed to go to the pooling account, right? Right. And it goes to the pooling account, then to someplace else. To Antwerp, that's correct. But the last two transactions are not on the account statements, are they? That's right, but even the first transaction, the money coming in isn't on their statement. So when they look at their statement and they're expecting a million dollars, there was a sale, they know of the sale, they know the money was supposed to come into the account, they're expecting it into their account. They look at that first statement, it's not there. At that point, they know that something is wrong. They have 30 days to reach out to the bank in writing to figure out what's happened. Are the statements in the record? The statements, I believe, are in the record, Your Honor. I'm not sure what the page numbers are. I can find them. But there's no dispute that the statements are going to say, when you look at them, that nothing happened, right? Nobody disputes that the money never ends up in their account. Everybody agrees on that. So they're expecting the money to be there, they know that it's coming, and it doesn't. What happens? They don't do anything. They start investigating, eventually. Eventually, they reach out to the bank, but they had 30 days to do so, and they didn't do it. Then they could have filed a lawsuit. They waited over two years to file a lawsuit. They knew from their account statements in New York, from KBC, the zero account statements, that the money didn't land in their ADB. So that's a separate issue, Your Honor. That's a separate issue. So you're not suggesting that there's anything on the account statements in New York that reflect a misappropriation of the funds? No, I disagree with that. Okay, so what? What on the account statements reflect misappropriation? So there's no money. They're expecting the Daliat customers to put money into their account, and they didn't. The money doesn't appear in their KBC New York account. It also doesn't appear in their Antwerp Diamond Bank account. But looking at their KBC account, they are... And when should that money have appeared? It should have appeared immediately, under their allegations, again, at A86, in the original complaint, in order for the banks to make sure they're not getting ripped off, that this money is ending up where it's supposed to end up. Those proceeds are supposed to immediately, immediately appear in their bank, come back to the bank. If that had happened, and if it had come into their account at KBC, there would have been a notation. When you looked at their statement, yes, it ultimately would have been a zero balance, but you would have seen those transactions. You would have seen an in and out. Exactly, Your Honor. And it ends up being there's no in and no out. There is nothing. And at that point, they should have been on alert. Oh, my gosh, something happened. We didn't get the money. Now, what is the theft that's going on there? That's the Daliat theft, sure. But it showed that there was something going on, that there was a theft, and they didn't act, that there was a fraud, and they didn't act. You're saying that the statement showed a theft. That's right. And let me just add one more piece, Your Honor, because I think this is really critical. We'll find them in the record, Your Honor. But they're going to show no in and no out. I think everybody will agree on that. But let me just make one more, I think, really important point about this. This argument comes up in our motion to dismiss below. Lazar addresses it in one sentence in a footnote. And all they say in that one sentence, I'm happy to quote it in its entirety, but they say, you couldn't have been able to tell. Here it is. Needless to say, Lazar could not have detected from a review of its KBC New York account statements that the theft at LKI Diamond Proceeds and other criminal acts committed by the racketeering enterprise. That is the full argument that they made before Judge Carter. It's in a footnote. It is one conclusory sentence. They don't explain any of the reasons why you maybe wouldn't have been able to know based on the statements. You're saying they waived it below? I am saying that they waived it below. And we make that argument in our brief. We cite this court's authority in Diesel versus Town of Lewisboro. But even beyond the waiver, to now allow them to make a much larger argument when they had waived one sentence, conclusory argument below, I think is unfair to Judge Carter. Judge Carter worked hard on this case. He sat through a two-day hearing. After three years of discovery, he came to a very reasonable conclusion. Lazar made not much of an argument about time bar. And if they wanted to do more with that, they could. And the fact that they didn't, I think, shows that it's waived. But even if it isn't waived, I think that it makes the point that they didn't really make any of these arguments. And all Judge Carter did was to say, in his opinion, you knew about it. You knew that there was a theft. Because eventually, you go to the bank and you say that there was a theft. How did you know about it? You've never told us how you know about it. And still, they have not said in this court. Who put the statements into the record? Lazar or KBC? Your Honor, I don't know the answer to that. Well, that would be interesting. And in any event, your time is well inspired. Thank you, Your Honor. Thank you. Mr. Stein, you have two minutes for rebuttal. Yes. We relegated the argument to a footnote because it was an absurd argument. And it certainly is not waived on appeal. I have to clear up the clear misconception that's being perpetrated here. Our theft claims, the RICO claims, do not depend in any way on the notion that the bank should have credited the funds to our KBC New York account. And in fact, Mr. Silverman said the funds were earmarked for our account. Totally untrue. That is not the case at all. Daliot's customers were never, in the normal course, they weren't supposed to send the money to Lazar directly. They would send the money to Daliot. Daliot would thereafter pay Lazar. But that payment could have been made in any number of ways. He didn't pay, I don't even think in the normal course, he did pay money to the KBC New York account. He paid other accounts in the normal course, in terms of what he was supposed to do. We did make the allegation in our original complaint, which is what Mr. Silverman is relying on, that the bank, instead of stealing it, should have credited to our account. The nature of the theft was that Daliot never paid it to Lazar. Is that correct? Correct. And bearing in mind, Your Honor, that these are consigned diamonds, so the funds are our property, right? It's not that money is fungible here. That money is our property. And the banks knew it when it hit the pooling account. It wasn't earmarked for our account. They misappropriated funds from that account. It's not, as Mr. Silverman said, that they should have gone to the KBC New York account, but instead were misappropriated. They weren't earmarked for the account at all. It was all part of a conspiracy. The scheme was to send the money to the pooling account, where they would be misappropriated and applied to Daliot's debts. And I just want to be crystal clear on this point. Yes, we have, and the allegation, even that the funds should have been credited to our account, is not in our RICO claim in the amended complaint. It supports certain of our contract-related claims, but the theft is entirely independent of that. Is there nothing comparable to a RICO claim in Belgium? I don't believe so, Your Honor. Is that why you don't want to try this case in Antwerp? Well, it's one of the reasons. They know diamonds there, right? They know the trade of diamonds, right? They do know diamonds, but Lazar is a New York company. It's been here for 100 years. It was damaged here. Congress has said that we should have this remedy. A U.S. plaintiff has a right to bring a RICO claim in a U.S. court where it has been victimized in the way that Lazar was victimized in this case. And KBC is here, too. This is the natural forum for these claims, and it's the forum that Congress intended, and that the parties, certainly for all the reasons we said, did not exclude on the basis of the Forum Selection Clause. So, Judge Sullivan, you're absolutely right. There's nothing in the account statements that would have put us on any sort of notice that the banks were stealing our money when they hit the pooling account. We didn't even know the funds. We didn't even know that Daliot had sold the diamonds. They were missing. All we knew was that we hadn't gotten paid. We didn't know that he had actually sold them and had customers send them to the pooling account pursuant to the scheme with the banks where they were going to misappropriate them and apply them to reduce his debt. This is just a theft, pure and simple, from the account. Well, their allegation, at least their argument in their brief, is that you guys knew about this, and Judge Carter found that you knew about this fraud. Your response is what? That you didn't have? You had three years, or whatever the statute of limitations is in New York. That's your view. Yeah, we didn't know about the fraud. We knew we weren't getting paid, and we had concerns about Daliot. Absolutely, and we brought those to the banks' attention, not knowing, and we asked them to help. We asked them to do an audit. We didn't know that they were in on the scheme, and that's what we would have had to have known if this account statement, 30-day provision, could at all be relevant. Yes, that's right. It took years of painstaking investigation. We had to hire private investigators. We ultimately figured out that the banks were in on this and were actually stealing the money, and then we brought a RICO claim. As Congress says, we have the right to do, and this is the kind of case, Your Honor, that I submit is handled and handled expertly in this courthouse every day. It's the type of claim, sophisticated commercial claim, that this court excels in. And here we have a New York plaintiff. We have a New York defendant that has offices here, at least. The theft occurred here. The contractual relationship itself, as Judge Carter did find, and the bank doesn't dispute, all of the payments and disbursements, we're talking about more than $2 billion, after November of 2001 flowed through the KBC New York account. And the credit facility and our rights and obligations pursuant to that, relevant to our contract-related claims, not our theft-related claims, are governed by New York law. This case belongs here. It's really a no-brainer. Just a quick question about the statements. So is it your contention that the statements were incorrect? No. So you're not challenging the correctness of the statements? Absolutely not. You're not suggesting there's an irregularity reflected on the statements? Zero. Zero contention to that effect. And I guess Your Honor has pointed out a couple of times Judge Carter's statement that every borrower is an account holder. But that begs the question, I submit, which is whether the parties intended different rules to apply, depending on whether the suit related to the customer standing as a borrower or it standing as an account holder. And as I said, and I don't think Mr. Silverman disputed this, our case relates to Lazar's, the contract-related claims only, relate to Lazar's status as a borrower. The theft-related claims don't relate to his contractual relationship with the bank in either sense. You also raised the question of how the closely-related doctrine. And it's our contention that the closely-related doctrine cannot apply, or even if you did find that any claims, any of the contract claims, I don't think you can find this with regard to the theft-related claims, but any of the contract claims are swept up by the ADB form selection clause, that would not affect the claims against KBC for three reasons. Reason number one, there's a separate form selection clause in the agreement with KBC that says claims against KBC shall be brought in the courts of New York. And it says any. Any means any, as I believe Mr. Silverman said. And by the way, just so our position is clear, we don't think that literally means any. We agree, or we don't agree because they don't take this position, but it would be our position that the claims still have to relate to the contract. That's what all the case law says. That's the only thing that makes sense. The provision you're talking about references the terms and conditions of the agreement. In a dependent clause, Your Honor. If you look at the first operative independent sentence, it says any. I've read it. You've read it. And Your Honor, to read that as a limitation would effectively rewrite the agreement to say that what the parties agreed to was that only claims related to the terms and conditions are subject to the form selection clause. That's not a reasonable reading. And if you read further in the sentence, it also applies to other agreements between KBC and the customer. And so I guess their position is without the limitation to terms and conditions. So I guess the bank's position is, well, if it's a dispute relating to another agreement, it's very broad. It covers everything, not just terms and conditions. But for this agreement, which has the form selection clause, it has to relate to terms and conditions. We submit that's not a reasonable reading. The second reason, if I can circle back on the closely related doctrine, is there's no case that's been cited to suggest that the separate form selection clause in the New York agreement would have to yield under the closely related doctrine. In addition, as I said, the New York form selection clause requires that claims related to other agreements between KBC and the customer are subject to the New York form selection clause. So that means that even if KBC had been a party to the ADB agreement, the claim against KBC would still be governed by the New York form selection clause. They weren't a party here, which means they were more distant. So we don't see how they could possibly take advantage of the closely related doctrine in such circumstances. Finally, there's a provision in the credit conditions that refers to unless otherwise agreed in writing. I think Mr. Silliman referred to this provision, the provisions of the credit conditions and the banking conditions control. Well, the New York account agreement for the KBC New York account is an agreement in writing, and it did otherwise provide. It provided that claims against KBC have to be brought in New York. So that should be the form selection clause that should control with respect to the claims against KBC. Thank you. Thank you both. You will put in writing. Okay. All right. 4,001 to 4,001. 153. Thank you very much. Thank you. We'll reserve decision. Thank you for lively argument.